# FOURTH DISTRICT, 1900.

SAN ANTONIO & GULF SHORE RAILWAY COMPANY v. SAN ANTONIO & GULF RAILROAD COMPANY ET AL.

### Decided December 5, 1900.

1.—Corporation—Directors as Trustees—Purchase by Directors at Receiver's Foreclosure Sale.

The directors of a corporation occupy towards it the position of trustees, and their acts in connection with the property, such as a purchase of it for themselves at a foreclosure sale, are controlled by the principles governing other trustees, as to the obligation of the trusteeship, and in determining what action on their part will constitute a fraud, and what remedies may be applied; and such a purchase by them is held voidable at the instance of the corporation.

2.—Same—Setting Sale Aside—Tender of Amount Required.

A railway corporation made a contract for the building of its road with a construction company which was composed in part of, and controlled by, men who were directors of the corporation. Thirty miles of the road were built, and the construction company received bonds of the railway corporation in payment therefor, and the road having then been placed in the hands of a receiver, certain directors of the corporation who were also members of the construction company bought in the entire property and franchises of the road for themselves, the payment therefor being made principally in claims for debts (bought up by such purchasing directors) which had been incurred by the construction company in building the road, and which were a lien against the property. Under the decree of foreclosure ordering the receiver to sell, the purchasers took the property freed of all claims, and as the bonds issued to the construction company were not filed in the receivership proceedings, the effect of the decree of foreclosure was practically to cancel the bonds. Held, in an action by the railway company to recover the property and to have the sale decreed to inure to its benefit, that plaintiff could not recover without offering either to pay back to the purchasers the amount so paid out for the property, or to rehabilitate the bonds by taking the property subject to the incumbrance created by them.

Appeal from Bexar. Tried below before Hon. R. B. Green.

*J. D. Guinn, Peter Shields, Jno. H. Clarke,* and *J. W. Parker,* for appellant.

*Denman, Franklin, Cobbs & McGown* and *John R. Shook,* for appellees.

FLY, ASSOCIATE JUSTICE.—This is a suit instituted by appellant in the District Court against the San Antonio & Gulf Railroad Company, George W. Brackenridge, George Dullnig, J. W. Graves, and E. S. Carpenter, independent executors of the estate of John Ireland, deceased, H. O. Engelke, J. C. Davis, John Scott, and the San Antonio National Bank. A general demurrer to the petition was sustained. The object of

the suit, as appears from the prayer is to obtain judgment for the title
and possession of the railway and other property belonging to appellant,
for damages, for injunction restraining Brackenridge or the San An-
tonio National Bank from collecting a judgment purchased by him or
it from the Illinois Steel Company out of property belonging to appellant
until the property of Dullnig and the Ireland estate has been exhausted,
and for costs, etc.

It was alleged in the petition that the appellant company was organ-
ized in 1894; that William Davis and others were elected its first board
of directors, and John Ireland its general attorney, and that he served
as such attorney until his death, on March 15, 1894; that a contract
was made with Massey & Co. to build the railway; but, failing in the
same, a contract was made by appellant with Ireland, Dullnig, Engelke,
J. C. Davis, and Scott, "commonly known as the 'Construction Com-
pany,'" whereby they agreed to construct the railroad and equip the
same in consideration of $12,000 per mile in bonds, secured by mortgage
upon its property; that by the contract the construction company was to
discharge all debts for material or labor used in the construction and
equipment of the railroad; that the construction company built about
thirty miles of railroad, and in so doing incurred an indebtedness for
labor, material, engines, and cars aggregating about $200,000; and that
appellant, relying upon the debts being paid by the construction company,
on January 8, 1895, issued to it $360,000 first mortgage bonds, and
they were received by the company as payment for the number of miles
of railway built. It was further alleged that Ireland, Dullnig, and
Engelke had William Davis removed, and Clifford elected a director and
made president, and that he filed a suit against William Davis and others
to obtain possession of the property belonging to the railway company,
and that an injunction was obtained against Davis and others to pre-
vent them from meeting and voting certain stock, which judgment was
reversed by the Supreme Court, and the cause remanded for another
trial; that afterwards Davis and his associate stockholders instituted
suit against appellant, Dullnig, Ireland, and others "for certain relief,
and praying the appointment of a receiver of plaintiff's (appellant's)
property," and Engelke and Dullnig joined in the request for a receiver.
The prayer for a receiver was granted, and Henry Terrell was appointed,
and qualified as such, and took possession of the property, rights, and
franchises of appellant, and held the same until the sale of the property
was made.

Appellant, after alleging all the foregoing facts as constituting a con-
spiracy, alleges that upon the appointment of a receiver the conspiracy
came to an end, and another was formed, and Ireland and Dullnig then
entered into a conspiracy to secure the property of appellant through a
receiver's sale; that Clifford resigned the presidency of the board of
directors, and was elected in his stead. It was further alleged: That
Ireland and Dullnig procured the filing of claim before the master in
chancery by Colley and Potts, and that upon a hearing appellant was

adjudged to be primarily liable for the same, amounting in the aggregate to about $800, for which a lien on appellant's property was foreclosed. That Ireland and Dullnig had really bought and owned said claims. That the court ordered a sale of the property of appellant to pay the debts at an upset price of $150,000, one-fourth in cash to be paid into court. That the sale was made on July 7, 1896, in pursuance of the said decree of April 11, 1896, and Oscar Bergstrom became the purchaser as trustee, and placed in the hands of the receiver a certified check for $37,500, the bid being $150,000, and the sale was reported for confirmation. "(9) · That, the said Ireland having died before the accomplishment of said conspiracy to acquire title to plaintiff's property, rights, and franchises through judicial sale thereof, his executors entered into said combination, and that they and said Dullnig were the persons for whom said Bergstrom purchased the property, and were his cestuis que trustent. That Bergstrom did not disclose, but concealed, the identity of his said principals. That thereafter, on the —— day of ——, 1896, said Bergstrom filed a written application to the court asking for the confirmation of the sale, and on November 28, 1896, the court, on consideration thereof, decreed that the report of sale be in all things approved and confirmed, and that said Oscar Bergstrom, as trustee for George Dullnig and the executors of the estate of John Ireland, deceased, bid at the sale $150,000, and that he, as such trustee, had fully complied with the terms and provisions of the decree, and had paid in the sum of $37,500 in cash; and that, as a large number of claims were pending upon intervention, which had not been passed upon by the court, and were not in condition to be paid at that time, further decreed that the balance of said money, viz., $112,500, should not be required to be paid in cash, but that the same should be paid into court within twelve months of the 15th of December, 1896, and that the possession of the property should be turned over to the said Bergstrom, as such trustee, on the 16th day of December, 1896, and that the special master and commissioner should convey by deed all of said property to said Bergstrom, trustee."

A description of the property is then given, among which the following is described: "Also the charter, rights, liberties, privileges, immunities, and franchises of this plaintiff of every kind and description whatsoever pertaining to said railway." That it was further decreed therein that the said Bergstrom, trustee, "should have and hold the said property, with all the appurtenances, rights, and privileges to each and every part thereof so sold and hereinbefore described, his successors and assigns, forever, free from any claim or demand whatsoever on the part of this plaintiff or its creditors," except for the balance of said $112,500, and that said property was to remain in the possession of said Bergstrom, subject to be retaken possession of by the court in the event they failed to pay the said balance of $112,500. And it was further ordered that to that end the said property was charged with a lien for the ultimate payment of said balance, with the power and right of the court

to repossess itself of said property to enforce the terms and provisions of the decree. In order to further secure the payment of said sum of $112,500, the said Bergstrom was required to enter into a bond conditioned that no claim or debt should be incurred which in law or equity could be held superior to the lien for the balance of said purchase money, and requiring said purchaser from time to time, and within ten days after he should be ordered by the courts so to do, to pay into court such pro rata part of the remaining balance of said purchase money as the court might decree upon claims which had been duly allowed and passed upon; and further decreed that the said Bergstrom should have the right to turn in any receipt, claim, or other evidence of debt or payment to the court upon the claim of any person entitled by the said decree to participate in said fund of $112,500, which claim, duly receipted or assigned, should be taken as though the same was cash for the pro rata share of said claim or interest, and, when paid in full of such pro rata share, should be a complete discharge of so much of said purchase price aforesaid. And the court further decreed that, after said property should be turned over to the said Bergstrom, the same should be free from all character of claims of all persons whomsoever incurred during the receivership and arising by reason of the operation of said road by the receiver, except so far as such claimants should have the right to participate in and be paid out of the said purchase price; and further decreed that the said receiver should not be held further responsible, and that the said Bergstrom, at his cost or expense, should provide the receiver with counsel to represent him in all suits then pending or might thereafter be brought which it was his duty to prosecute or defend, and that the said receiver for any services rendered by him in connection with such litigation should be allowed just compensation, to be paid out of any balance of the purchase money remaining, but in no case to be a charge upon the property purchased, except in so far as the said balance of the purchase money was a charge thereon. The decree also provided a time within which all interventions should be filed. It is then alleged that said Bergstrom went into actual possession of said property, and on the —— day of ——, 1897, said Henry Terrell was discharged as receiver, and the receivership of said property terminated; that when Bergstrom purchased the property for said Dullnig and Ireland's executors it was contemplated that another railway corporation should be formed to own and operate said railway, and that they did form the defendant San Antonio & Gulf Railroad; that on the 29th day of May, 1897, said Bergstrom, as trustee, and the said Dullnig and the said Ireland's executors, conveyed and delivered said property, rights, and franchises to the San Antonio & Gulf Railroad in consideration that it assumed to pay the balance of the purchase money, viz. $112,500. Then follows a description of the property so conveyed.

It is then averred, while Bergstrom deposited said certified check, that the said amount was in fact paid in claims of laborers and materialmen, which were owed by the said Ireland and Dullnig as members of the said

construction company, and by the said Ireland's executors as successors to his estate, "which they pretended to buy up at great discount," and that the balance of said purchase money was paid by them and the said San Antonio & Gulf Railroad in other of such claims which they likewise pretended to buy up at great discount; that it is impossible to give the names of the laborers whose claims were so used, owing to the great number thereof, and to the fact that the same are unknown to plaintiff, but that the value thereof amounted to about $60,000; that the following are some, if not all, of the materialmen's claims used in paying said purchase money, viz., $16,068, Pittsburg Locomotive Works; $34,195.92, Vaughn Lumber Company; $83,761.96, Illinois Steel Company. It is then averred that plaintiff did not owe the said labor and materialmen's claims, but that by the operation of law its railway was charged with a statutory lien for the payment thereof, and that on that account its property sustained to the construction company the relation of a surety for the payment of said claims. And it is further averred that it did not owe any debts, and was not liable for any damages to any person, company, or corporation, "but that, if it should be that it did owe any debts or was liable for any damages at the time of the application for the sale of its property and of the ordering of the sale thereof as aforesaid, then the same was a trifling amount, to wit, not exceeding $1000, and that it had abundant means and credit to pay the same."

Plaintiff further alleges that the said bonds delivered in payment for the building and equipping of its railway were not presented as a claim in said receivership, nor was any coupon for interest thereon presented, but it alleges the fact to be that the said Dullnig and Ireland's executors disputed the validity of said bonds, and denied that they or the construction company had accepted the same; and it avers that the sale of its property by the receiver was not ordered or made for the purpose of paying said bonds, or any of them, or any accrued interest thereon. "(10) It is averred: That said receiver's sale is void for the reason that each and every claim presented against the plaintiff in the said receivership was originally filed with the master in chancery appointed by the court in said receivership, and not with the clerk of the court; and that on the filing of each claim the master would issue a notice to the parties in interest requiring them to appear before him at a given time for the purpose of contesting the claim, if they saw proper to do so, except that he never gave this plaintiff such notice, nor any notice, in any case, and this plaintiff did not, in person or by attorney or agent, appear before the said master upon the hearing of any claim by him. That upon the hearing of each claim the master would make his findings, and report them to the court in which the receivership was pending, and the court would render judgment for or against this plaintiff, without notice to it, and without its appearing in person or by attorney; and that this plaintiff was not served with any citation to appear and answer any claim or demand presented against it in the said receivership, and each and every judgment rendered therein against it, including

the said Le Grand and Potts judgments, was and is for that reason null
and void, and were without due process of law. That a great many
claims were filed by the master, but that they are too numerous to be
mentioned, but that the foregoing allegations are true with respect to
each of them." The allegations in the petition with reference to the
property purchased being held in trust by the purchaser are as follows:
That if it shall be held that the court had power to order and confirm
the sale of its property at the time it did, the effect of the sale and con-
firmation was to vest in Bergstrom the legal title to the property, fran-
chises, and rights, in trust for the plaintiff, because said Ireland and
Dullnig, and the Ireland executors, as successors to his estate, were under
contract with plaintiff to protect its property, rights, and franchises
against sale for the payment of debts for which the same was sold at re-
ceiver's sale as aforesaid; for that Ireland, who at the time claimed to
be president and director of plaintiff, conspired with Dullnig, Colley,
Le Grand, and Potts to get the title to plaintiff's property, etc., through
a receiver's sale as aforesaid, and upon his death was succeeded in the
conspiracy by his independent executors, together with Dullnig, Colley,
Le Grand, and Potts, and that they carried out the conspiracy and ac-
quired plaintiff's property, etc., at the receiver's sale as aforesaid; that
the debts for which the property, etc., was sold were the debts of Dull-
nig and the Ireland executors, and not the debts of plaintiff.

And it is averred as follows: "And if this plaintiff did owe any debts,
or was liable for any damages,—which it does not admit, but denies,—
then it had abundant means and credit with which to pay the same, and
it was the duty of the said Ireland and Colley, who, acting as the direc-
tors of this plaintiff, to have paid the same, and, had they been faithful
to their trust, they would have paid the same; and plaintiff now pro-
poses to reimburse the defendants or any of them any sum or sums of
money that they or either or any of them may have paid in satisfaction
of any valid indebtedness of this plaintiff which it primarily owed, and
consents that its right of recovery herein may be conditioned upon such
reimbursement; and plaintiff alleges that the defendant San Antonio &
Gulf Railroad Company, when it took the conveyance from said Brack-
enridge, Dullnig, and Ireland's executors, as aforesaid, knew the facts
which affected the property with a trust in the hands of said Bracken-
ridge in favor of plaintiff, or by the use of ordinary care could have
known them." Subdivision number 14 in the petition contains aver-
ments with reference to the transfer of property by Ireland and Dullnig
to defeat the Illinois Steel Company's claim, and with reference to the
purchase of said judgment by the San Antonio National Bank,—matters
not necessary to be considered for the present. Subdivision number 15
claims damages growing out of the handling of the road by Bracken-
ridge or the San Antonio & Gulf Railroad, and need not be now con-
sidered. The concluding part of the petition contains allegations seek-
ing to recover damages of the defendants Dullnig, Graves, and Carpenter
for converting the property, and this need not now be considered. In

this latter portion of the petition the following is averred: "By way of pleading in the alternative, plaintiff alleges that the said construction company, composed as aforesaid, in its contract with plaintiff to build and equip its railway, obligated themselves to pay all claims for labor and material that would, by law, become a lien upon its property; that, though they contracted the debts hereinbefore enumerated in the construction and equipment of plaintiff's railway under their said contract, and which debts were, by law, a lien upon its railway, they wholly failed to pay the same, and wrongfully allowed plaintiff's said railway, and all its properties, rights, franchises, and privileges, to be sold at receiver's sale to satisfy said debts, as hereinbefore alleged; that plaintiff was without means or credit, and was powerless to prevent said property from selling, and says, if it shall be held that the sale of said property by the receiver, as aforesaid, was valid and legal, and divested plaintiff of the title thereto, then said defendant George Dullnig and said J. W. Graves and E. S. Carpenter, as executors of the estate of John Ireland, deceased, and the said H. O. Engelke, J. C. Davis, and John Scott, are liable in damages to plaintiff for the value of all said properties, which it alleges were well and reasonably worth the sum of $500,000, and that by the loss thereof plaintiff has been actually damaged in said sum."

It is not claimed by appellant that it attempts in this proceeding to attack and set aside the judgment in the case in the District Court in which the receiver was appointed, and this court will not enter into a discussion of the question of collateral attack upon the judgment. It is admitted that the court, "having taken possession of plaintiff's (appellant's) property through a receiver, had the power to order the sale thereof upon its own motion, as well as upon the application of a creditor." The ground upon which appellant bases its suit is that its directors had, at a foreclosure sale, bought its property, and that, being its directors, they were trustees for it, and that the sale inured to its benefit. We understand, therefore, that this suit is not an attack upon the valid judgment of a court of competent jurisdiction in a collateral proceeding, nor can it be set down as in the nature of a bill of review brought to correct the judgment, because it is lacking in the characteristics of that class of proceeding, but it is simply a suit to have it declared that the directors were trustees for their corporation, and were representing it in the purchase of the property at receiver's sale, and that the benefits arising from the sale must be obtained by the corporation. On that line the matter will be considered in this opinion.

Directors of corporations occupy towards them the position of trustees, and their acts in connection with the property of the corporation are controlled by the principles governing other trustees, and the obligations of the trusteeship are made the basis for the ascertainment of what acts on the part of directors will constitute a fraud, and the remedies that may be applied. Cook on Corp., sec. 648; Perry on Trusts, sec. 207. Being in the position of trustees, the directors of the corporation could not purchase its property for themselves, and such purchase would be void-

able at the instance of the corporation. · "The law is well settled that a director's purchase of property from the corporation is voidable at the option of the corporation, even though the directors paid fully as much as, or more than, the property is worth." Cook on Corp., sec. 653. While the corporation can enter a court of equity, and prosecute its claim to the benefits of a purchase of its property by its directors, it must come, as must every one else who comes into a court of equity, doing equity at the same time that it seeks it. Pom. Eq. Jur., sec. 392. According to one of the allegations in appellant's petition, Ireland and Dullnig, as members of a construction company, entered into a contract with appellant to build and equip its railroad, paying all expense arising therefrom for labor or material, and agreed to accept as payment for such construction and equipment the bonds of the railway, and did so accept bonds in the sum of $360,000. When, therefore, Ireland and Dullnig bought up the claims of the laborers and materialmen to whom they were indebted, but who had a statutory lien on the property of the railroad company, they were doubtless paying their own debts. But they had their bonds. Certain stockholders came into court, and asked for the appointment of a receiver; appellant, as a matter of course, being a party. The receivership was granted, and certain debts were proved up, for which appellant was primarily liable, and the property was sold, Ireland and Dullnig being the purchasers. The bonds were not filed as claims in the receivership proceeding. The sale was reported to the court, and it was decreed that the purchaser "should have and hold the said property, with all the appurtenances, rights, and privileges to each and every part thereof so sold and hereinbefore described, his successors and assigns, forever, free from any claim or demand whatsoever on the part of appellant or its creditors." The effect of that decree was to cancel and forever destroy the bonds issued to Ireland and Dullnig. They could never afterwards affect the property, no matter in whose hands it might be, as they were held by Ireland and Dullnig at time of sale. Appellant has come into a court of equity, and asked that it be substituted for the purchasers at the sale, and that it may obtain all the benefits arising therefrom; and all the equity that it offers to perform for the great service to be rendered it by the court is the payment of less than a thousand dollars. In other words, it asks a court of equity to place it in possession of thirty miles of railway property, equipped, for which it has not paid a dollar, upon repayment to the purchaser at the receivership sale of less than a thousand dollars. If this prayer should be granted, appellant would be the owner of a railroad paid for by its directors. In the petition appellant alleges that it was not primarily liable for any but a few hundred dollars of the indebtedness for which the property was sold, and its only offer to do equity is to repay any sum of money paid by the purchasers "which it primarily owed." There is no offer to take the property incumbered with the bonds issued to Ireland and Dullnig, or to pay the amounts paid out by them for labor and material. It would seem that in equity and good conscience, if it did

not wish to pay the indebtedness for labor and material, it ought to offer to rehabilitate the bonds. We think appellant should have evinced a willingness to do one or the other, and, failing to do so, it has no place in a court of equity. In the case of Harpending v. Munson, 91 New York, 650, a stockholder had bought the suit against Munson, a director in a railroad corporation, to redeem, as such stockholder, from a foreclosure and sale of road, the same having been bought by Munson; and after discussing some other points in the case, the court said: "But the most hopeful view of the case for the appellant is that which treats the action as brought to impress a trust upon the property in the hands of Munson for the benefit of stockholders, upon the ground that as to them he was a wrongdoer. Practically this means that he should be adjudged to hold the legal title which he had acquired for the benefit of the original company and its stockholders, because of his fraudulent conduct in procuring the default which culminated in the foreclosure. Practically this would be equivalent to setting aside the sale. But a further trouble with this view of the case is that he who seeks equity must do equity. If Munson is to be treated as trustee, his lien upon the legal title for the debt can not be disregarded. The bonds he held were honestly issued, and represent an honest debt, which the company or the stockholders are bound to pay before they take from him the property he has bought. If he is not the absolute owner, he at least is such to the extent of his debt, and can defend his possession in equity until it is paid. Granting that we may wipe out all that has been done, we can not wipe out his debt or his lien. The stockholders, therefore, can only impress a trust upon his legal title, and so reclaim the property for their benefit by first paying and discharging Munson's debt; and such an offer is essential to their right of action. The suit becomes a bill to redeem. Story, Eq. Pl., sec. 187a. But none such is pleaded or proved. The one pleaded is only of $171, and there is no offer of anything else."

Under the view of the case herein presented, it becomes unnecessary to consider the numerous matters raised by different assignments of error or points raised by special demurrers. The judgment will be affirmed.

*Affirmed.*

Writ of error refused.